UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | NO. 19-cr-201 (PAM/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Manuel Rodrigo Acevedo (2), | |
| Defendant. | |

Thomas M. Hollenhorst, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for the Government.

Robert D. Sicoli, Sicoli Law, Ltd., 333 South Seventh Street, Suite 2350, Minneapolis, Minnesota 55402, for Defendant Manuel Rodrigo Acevedo.

## INTRODUCTION

Defendant Manuel Rodrigo Acevedo was arrested after police had conducted a controlled drug buy in which Acevedo was neither present nor involved. Instead, relying on uncorroborated and non-specific information provided by the suspect police had arrested during the controlled drug buy, police arrested Acevedo. Law enforcement used evidence they gathered during Acevedo's arrest to secure three search warrants that produced evidence which formed the basis for Acevedo's indictment. Acevedo now seeks to suppress the evidence obtained incident to his arrest and the subsequently seized evidence he contends is fruit of the poisonous tree.

Police lacked probable cause to arrest Acevedo at the time they seized him, thus violating his constitutional right to be free from unreasonable seizure. Further, the Government has not established that law enforcement would have inevitably discovered

the evidence obtained as a result of the unconstitutional arrest through independent means. This Court thus recommends that Acevedo's motion be granted and the evidence identified be suppressed.

## FINDINGS OF FACT

**I.     The Investigation and Arrest of Guerrero-Aguilar**

In the Fall of 2018, members of the FBI Safe Streets Task Force learned of a drug distribution operation in Minnesota. Oct. 9, 2019 Hr'g Tr. 7, Dkt. No. 80. As part of their investigation of that operation, law enforcement agents used a confidential human source ("CHS") to make five controlled drug buys from a suspect, Jesus Guerrero-Aguilar. *Id.* at 8. Agents set up a sixth buy for four pounds of methamphetamine, to take place July 11, 2019. *Id.* at 8-9.

Around 4:45 p.m. on July 11, 2019, agents observed Guerrero-Aguilar carry a large grocery bag into a white van parked outside a thrift shop in New Hope, Minnesota. *Id.* at 23. Guerrero-Aguilar then drove to an address on Unity Avenue North, where he met a woman outside a house. *Id.* at 24. Guerrero-Aguilar and the woman entered the house, but agents did not note whether he had the grocery bag with him. *Id.* at 24-25. At about 5:30 p.m., Guerrero-Aguilar left the house on Unity Avenue North and drove to an AutoZone auto parts store. *Id.* at 25. He went into the store for a few minutes, then got back in the van and drove away. He eventually arrived at a Marshalls parking lot. *Id.* at 9-10, 25. Guerrero-Aguilar pulled up to another van parked in the lot, rolled down his window, and talked to whomever was in the other van. *Id.* at 26-27.

It is unclear whether the other van left or Guerrero-Aguilar moved to a different spot in the parking lot, but the vehicles went their separate ways. *Id.* at 27. Shortly after

6:00 p.m., a gold Honda Pilot arrived and parked next to Guerrero-Aguilar's van. *Id.* at 10. Guerrero-Aguilar left his van and got into the back seat of the Pilot. *Id.* He was in the back of the Pilot for a short time before he returned to his van. *Id.* Agents did not see him carry anything into or out of the Pilot, nor did they testify that they observed any furtive or suspicious activity inside the Pilot while Guerrero-Aguilar was in it. And, they did not know who else was in the Pilot at that time. *Id.* at 10-11, 25-26. Once he returned to his own van, Guerrero-Aguilar drove to the Cub Foods in Crystal, Minnesota, where the drug buy was scheduled to take place, and met the CHS. *Id.* at 11. Once the CHS gave a pre-arranged signal, agents moved in, arrested Guerrero-Aguilar, and removed four bags of methamphetamine from the CHS's car. *Id.* at 11-12.

## II.   Acevedo's Arrest and Search

Upon arresting Guerrero-Aguilar, agents took him to the FBI office in Brooklyn Center and interrogated him. *Id.* at 13. Meanwhile, other agents continued to surveille the Honda Pilot and its occupants. *Id.* at 12. After Guerrero-Aguilar left to meet the CHS, agents watched two men get out of the Pilot and go into the Marshalls. *Id.* at 28-29, 40-41.

Shortly into his interrogation, Guerrero-Aguilar stated that he got the methamphetamine he sold to the CHS from a person named Sapito in the Honda Pilot, whom he was supposed to meet at a restaurant after the sale. *Id.* at 13-14. At that point, one of the agents left the interview, called a member of the surveillance team, and asked them to detain[1] the occupants of the Pilot. *Id.* at 29-31, 38. Guerrero-Aguilar also saw a

---

[1] Although Special Agent Dixon Kuglin said his fellow agent asked that the occupants be detained, he otherwise referred to the detention as an arrest. Hr'g Tr. 15-16, 21, 28-29.

3

surveillance photograph of the man agents believed to be the driver of the Pilot, but could not say whether it was Sapito. *Id.* at 29-30.

Back at the Marshalls parking lot, agents watched the two men and a woman leave the Marshalls store and get into the Honda Pilot. *Id.* at 40-41. Within a minute of their return to the Pilot, law enforcement moved in and arrested the three individuals. *Id.* at 41. One of the law enforcement officers who took part in the arrest was Deputy Mark Altendorfer of the Ramsey County Sheriff's Office. *Id.* at 39. After handcuffing and searching the driver, Deputy Altendorfer searched Acevedo, who had been removed from the front passenger seat and was already in handcuffs. *Id.* at 41-42. During the search, Deputy Altendrofer found a hotel key card for the North Star Inn and Suites in one of Acevedo's pockets. *Id.* at 16-17, 42. At some point following Acevedo's arrest, while agents were still interviewing Guerrero-Aguilar, agents showed Guerrero-Aguilar a picture of Acevedo, whom Guerrero-Aguilar identified as Sapito. *Id.* at 30. Agents impounded the Honda Pilot at the FBI offices in Brooklyn Center. *Id.* at 19.

The next day, agents followed up on the hotel key card by going to the North Star Inn and Suites. Gov't Ex. 3. After learning what room Acevedo had rented, officers went to the hallway outside the room with a K-9 unit. *Id.* (Application p. 3). The dog alerted to the presence of narcotics at the room's door. *Id.* With this information, officers obtained a warrant and searched the room. *Id.* (Search Warrant); Hr'g Tr. 20.

Law enforcement officers also obtained and executed a search warrant for the Honda Pilot. Gov't Ex. 1. They found, among other things, a cell phone on the passenger seat. *Id.* (Receipt, Inventory, and Return); Hr'g Tr. 19-20. Officers subsequently obtained a separate search warrant for the phone. Gov't Ex. 2.

## CONCLUSIONS OF LAW

The Fourth Amendment of the United States Constitution guarantees a person's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const., amend. IV. Because the Fourth Amendment contains no enforcement provision of its own, the Supreme Court created "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)). This "exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and, relevant here, evidence later discovered and found to be derivative of an illegality . . . ." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

Acevedo argues the law enforcement agents lacked probable cause to arrest him, violating his Fourth Amendment right to be free from unreasonable seizure, and requiring the suppression of any evidence seized incident to that unlawful arrest. Because information obtained incident to the arrest directly (and solely) led to law enforcement securing the three search warrants and the positive identification by Guerrero-Aguilar, Acevedo argues this evidence must also be suppressed as fruit of the poisonous tree. The Government does not dispute that the search of Acevedo's person incident to his arrest "led directly to the discovery of [Acevedo's] place of lodging" and to the evidence seized therein. Gov't Br. 4-5, Dkt. No.83. Rather, it argues the agents had probable cause to arrest Acevedo and, even if they did not, discovery of the evidence was inevitable. The Court agrees with Acevedo.

## I. Lack of Probable Cause to Arrest

Law enforcement do not violate the Fourth Amendment by arresting someone in a public place without a warrant, so long as they have probable cause to think the person committed a felony. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). So the question is whether the agents had probable cause to believe Acevedo had committed a felony at the moment they arrested him. They did not.

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 370-71 (quoting *Gates*, 462 U.S. at 232). "Probable cause to arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *United States v. Edwards*, 891 F.3d 708, 711 (8th Cir. 2018). Although this is "not a high bar," and does not require an "actual showing of [criminal] activity[,]" *id.*, a "bare suspicion" is insufficient. *United States v. Morales*, 923 F.2d 621, 624 (8th Cir. 1991). A court reviewing a warrantless arrest must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."[2] *Pringle*, 540 U.S. at 371 (internal quotations omitted).

---

[2] Law enforcement agents who conduct a warrantless arrest are not entitled to the same deferential review this Court would give a fellow judicial officer's finding of probable cause when issuing a warrant. *Cf. Ornelas v. United States*, 517 U.S. 690, 698-99 (1996) ("[P]olice are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination . . . is less than that for warrantless searches.")

6

Although agents may have had a reasonable suspicion Acevedo had committed a felony at the moment they arrested him, this suspicion did not rise to the level of probable cause. The Government emphasizes only two pieces of information to support probable cause: (1) agents saw Guerrero-Aguilar get into the Honda Pilot for a brief time before getting out and immediately continuing on to meet the CHS, and (2) Guerrero-Aguilar said he got the drugs from a person in the Pilot whom he knew as "Sapito."

Guerrero-Aguilar's brief visit to the Pilot may indeed raise suspicions about that vehicle's occupants, as they associated with a suspected drug dealer. But such a visit is equally consistent with less nefarious conduct, such as dropping off sports tickets, and cannot alone create probable cause. *E.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Officers did not observe what took place in the Pilot and did not see Guerrero-Aguilar take anything from the Pilot when he left. The Government argues that law enforcement did see Guerrero-Aguilar carrying drugs out of the Pilot because he must have concealed them. Perhaps he did. But probable cause cannot be founded upon such question begging that requires, as its premise, the very conclusion necessary to establish probably cause—here, that Guerrero-Aguilar got the drugs from somebody inside the Pilot.

The agents' surveillance of Guerrero-Aguilar throughout the day only undermines the import of his brief stint in the Honda Pilot. Law enforcement saw Guerrero-Aguilar carry a white bag into his van earlier that day, the only time, according to the record, they noted him carrying anything at all. The Government suggests that "it would be quite unusual for a drug dealer to openly carry bags containing drugs in the full view of others." Gov't Br. 7. Yet such instances abound, including in the caselaw the Government cites. In *United States v. Romero,* the Tenth Circuit found that police had reasonable suspicion

7

to briefly stop two suspected drug dealers when, while following up on a tip, the officers observed the men carrying five grocery bags to a car. 692 F.2d 699,702 (10th Cir. 1982). It does not strike the Court as unusual for drug dealers to carry bags in public that, though containing illicit drugs, give no outward appearance of illegality. Officers then saw him meet briefly with a woman and go inside a house, only to drive away a short time later. They also observed both his brief visit to the AutoZone and his discussion with the driver of another van in the Marshalls parking lot. This leaves his visit with the occupants of the Pilot as but one of numerous interactions the agents observed in which Guerrero-Aguilar could have obtained the drugs, had he not done so before he came under surveillance that day. Thus, the officers' observation of Guerrero-Aguilar's brief visit with the people in the Pilot is insufficient, standing alone, to establish probable cause to arrest Acevedo.

Law enforcement had one other piece of information at the time of arrest. Early into his interrogation, Guerrero-Aguilar said he got the methamphetamine from someone in the Honda Pilot, and that he was supposed to meet that person at a restaurant after the sale. Again, this creates reasonable suspicion linking Acevedo to the drugs. It does not, however, push the needle into the realm of probable cause because Guerrero-Aguilar's statement was an uncorroborated tip.

To contribute to probable cause, the information that officers rely on must be reasonably trustworthy. *Edwards*, 891 F.3d, at 711. In the context of information received from people outside law enforcement, courts generally require a history of reliability, corroboration of at least some details of the tip, or both. *See, e.g.*, *id.* at 711-12 (finding that the informant's history of reliability, coupled with "independently corroborated details" established probable cause); *United States v. Parish*, 606 F.3d 480, 486-87 (8th Cir.

8

2010) (emphasizing that police corroborated details provided by a confidential informant before the arrest); *United States v. Marchena-Borjas*, 209 F.3d 698 (8th Cir. 2000) (finding that the "historical reliability of the confidential informant, his provision of descriptive information not easily discoverable, and the independent corroboration of his information by investigating officers together established probable cause" for arrest).

Here, the police lacked either indicia of reliability. The only history law enforcement had with Guerrero-Aguilar was as a suspect, not an informant who had given reliable information in the past. To the contrary, the context of his statement, made during a post-arrest interrogation, casts serious doubt upon its reliability. Guerrero-Aguilar may have been trying to tell agents what he thought they wanted to hear; or, he may have been attempting to misdirect them to buy time for his actual co-conspirator to get away. The circumstances of his statement create an array of incentives that might either enhance or detract from his credibility. Further, agents did not attempt to corroborate details about an unidentified individual whom they never before had heard of or seen before they ordered the arrest.[3] Agents could have corroborated what Guerrero-Aguilar told them by, for instance, following the Honda Pilot to the restaurant where they were supposed to meet.

There is some authority for the proposition that, when the informant is an eyewitness to a felony, such as a victim, "the essence of reliability may be found in his statement of facts." *United States v. Easter*, 552 F.2d 230, 233-34 (8th Cir. 1977). But that rationale does not extend to the present case. In *Easter*, the alleged victim provided

---

[3] There is some ambiguity as to whether agents showed Guerrero-Aguilar a surveillance photograph of the Pilot's driver before they called for the arrest. However, even if the picture was poor quality, Guerrero-Aguilar's inability to positively say whether the picture was of "Sapito" only undermines his credibility.

9

information about an armed robbery that had just occurred. *Id.* at 233. The victim "was excited" and provided specific details, including that he saw the suspects enter a house with a sawed-off shotgun and a revolver. *Id.* Even then, the Eighth Circuit emphasized that part of the probable cause analysis was the exigent circumstances the police faced with information about two armed suspects. *Id.* at 234. No such exigency existed here, as there was no indication that anyone in the Pilot was an immediate threat to public safety. Nor, for the reasons already noted, is it reasonable to lower the credibility threshold for an "eyewitness" who was also an active participant in the alleged criminal conduct. Thus, Guerrero-Aguilar's statement that he got the methamphetamine from someone in the Honda Pilot, either alone or in combination with the officers' observations, does not establish probable cause to arrest Acevedo.

There is also some authority outside the Eighth Circuit holding that the uncorroborated confession of a co-defendant can establish probable cause for arrest.[4] In *Craig v. Singletary*, the *en banc* Eleventh Circuit cited a line of cases in which it had found the uncorroborated testimony of accomplices and co-conspirators sufficient to prove guilt beyond a reasonable doubt. 127 F.3d 1030, 1044-45 (11th Cir. 1997). Without a single citation or further analysis, the Eleventh Circuit concluded "[i]t would be anomalous for us to hold that even though a codefendant's uncorroborated testimony can prove guilt beyond a reasonable doubt, the confession of a co-defendant that he and the suspect committed the crime is insufficient to establish probable cause." *Id.* at 1045. This summary holding elicited a fiery partial dissent from three judges. Although agreeing that the totality of the circumstances gave the arresting officers probable cause, the dissent

---

[4] Neither side brought this authority to the Court's attention.

10

saw the majority as deciding a question it need not address, and deciding it incorrectly. *Id.* at 1046-47 (Godbold, J., dissenting). In the dissent's view, the majority gave no good reason why a co-defendant's statement should be viewed less stringently than any other informant's. *Id.* at 1047-48. Finally, the majority was incorrect to see any anomaly, as the "[s]ufficiency of the evidence to support a conviction implicates the decision of a judicial officer, made following indictment, sworn trial testimony, the right to counsel, the right to object, cross-examination, and the confrontation clause, and, if it reaches the constitutional levels, concerns the Fifth Amendment." *Id.* at 1048.

Although the Eighth Circuit has consistently held the uncorroborated testimony of an accomplice "sufficient to sustain a conviction if the testimony is not otherwise incredible or unsubstantial on its face[,]" *e.g.*, *United States v. Ramirez-Maldonado*, 928 F.3d 702, 707 (8th Cir. 2019), the *Craig* dissent is correct that such a holding cannot be extended to warrantless arrests. The uncorroborated testimony resulting in a conviction is subject to a battery of procedural safeguards designed to test its veracity in front of a neutral judge or jury. No such protections exist when an overeager law enforcement officer can use an unverified statement from an (alleged) co-defendant to arrest an individual without resort even to the warrant process. This is the type of rash conduct the Supreme Court, beginning with *Illinois v. Gates*, 462 U.S. 213 (1983), has attempted to mollify by ensuring that searches and seizures are based upon "reasonably trustworthy information." And, as discussed above, this Court sees no good reason to treat the statement of a potential co-defendant as more inherently trustworthy than that of any other informant. If found to be trustworthy, a co-defendant's confession may carry great weight in the probable cause

analysis. Such a confession—"naked, unvarnished, and uncorroborated"—however, deserves no unique deference. *Id.*

In sum, the information law enforcement had at the moment they arrested Acevedo raised reasonable suspicion that he was engaged in drug trafficking. However, without further observation by law enforcement of drug-related activity or the corroboration of Guerrero-Aguilar's claim, "the record lacks the strong factors typically associated with establishing probable cause[.]" *United States v. Anguiano*, Crim. No. 17-135 (ADM/DTS), 2017 WL 6501840, at *7 (D. Minn. Dec. 19, 2017). Without probable cause to arrest Acevedo, law enforcement could not constitutionally search him incident to that arrest.

## II.     Inapplicability of the Inevitable Discovery Exception

Not all Fourth Amendment violations mandate suppression of the evidence wrongly seized. Because the exclusionary rule balances societal interests by "putting the police in the same, not worse, position that they would have been if no police error or misconduct had occurred[,]" the rule has a number of exceptions. *Nix v. Williams*, 467 U.S. 431, 443 (1984). Here, the Government invokes the inevitable discovery doctrine. Extending the rationale of the independent source exception to the exclusionary rule,[5] the inevitable discovery doctrine provides that evidence seized by unlawful means need not be suppressed "if the prosecution can establish by a preponderance of the evidence that the information . . . ultimately or inevitably would have been discovered by lawful means[.]" *United States v. James*, 353 F.3d 606, 616-17 (8th Cir. 2003). To save the tainted evidence from suppression, the Government must show both that "(1) there was a

---

[5] The independent source doctrine saves from suppression "evidence acquired by an untainted search *which is identical to the evidence unlawfully acquired* . . . ." *Murray v. United States*, 487 U.S. 533, 538 (1988) (emphasis original).

12

reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* at 617.

The Government argues that agents had reasonable suspicion to stop and investigate Acevedo for a brief time.[6] During the brief investigatory stop, the Government asserts, they would have obtained probable cause to arrest Acevedo, then searched him incident to that arrest, and gone down the same investigatory path that they did. This analysis perverts the inevitable discovery doctrine and would, if followed, allow the exception to subsume the rule.

The fundamental flaw in the Government's analysis is that it fails to identify the "substantial, alternative line of investigation" that officers were then pursuing that, had it been further pursued, would have inevitably led to the constitutional discovery of the evidence. Instead, the Government asks the Court to look at the investigation that was pursued but remove the taint by imagining what could have happened if law enforcement had not blundered. This distinguishes the present case from every authority the Government cites. For example, in *Nix,* when it first adopted the inevitable discovery doctrine, the Supreme Court concluded that the victim's body would have inevitably been discovered because there was already a large-scale and thorough search being

---

[6] As stated in the discussion of probable cause, law enforcement had reasonable suspicion that Acevedo was involved in the drug sale, which is the lower standard required for a brief investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny.

13

conducted, which was only called off after the defendant's illegally-obtained confession. 467 U.S. at 448-50.

The Government's other authority follows a similar pattern. In each, the court's analysis emphasizes that "[n]o step in [the] hypothetical sequence would have violated the Fourth Amendment or depended on any Fourth Amendment violation." *United States v. Howard*, 729 F.3d 655, 663 (7th Cir. 2013). For example, in *United States v. Brown*, the Eighth Circuit noted in a passing, alternative holding, that officers would have inevitably discovered drugs seized from the defendant in a pat-down that exceeded the proper scope under *Terry* because they were simultaneously investigating a shooting involving the defendant. 217 F.3d 605, 606-07 (8th Cir. 2000). In *United States v. Romero*, an officer exceeded *Terry* when he found drugs on the defendant during a frisk. 692 F.2d at 703. However, the officer's partner was simultaneously and legally investigating the defendant's van, and that search resulted in probable cause to arrest the defendant just seconds after the unlawful frisk. *Id.* at 704. Hence, there was "a lawful investigation already underway." *Id.* Similarly, in *United States v. Allen*, the Tenth Circuit found that, assuming officers did not have probable cause to arrest the defendant when they did, they would have had probable cause "seconds later," after another officer legally found cocaine on defendant's companion, corroborating other information officers already had. 986 F.2d 1354, 1357 (10th Cir. 1993).

It is not surprising that the Government does not offer authority adopting its reasoning: it would create a perverse incentive for law enforcement. If agents know that the evidence will be saved simply by showing they *could have* acted within the bounds of the Fourth Amendment, why not cut constitutional corners? The simple reality of the

14

present case is that the agents stopped and arrested Acevedo before inquiring any further. That they *could have* lawfully stopped him in a different manner is immaterial given that they *in fact* stopped and arrested him.

Finally, even adopting the Government's analysis, the probable cause conclusion would not change. The only additional information the Government shows the agents would have received from the hypothetical *Terry* stop is a photograph of Acevedo that agents could have used to obtain a positive identification of Acevedo as "Sapito" by Guerrero-Aguilar.[7] This would not supply the missing element of reliability or excuse the agents' failure to independently corroborate the information. In fact, the suggestion that it might do so is belied by the Government's argument that it did not need probable cause particularized to only one person in the Pilot. The close association between the individuals in the car makes it "reasonable to infer that [the defendant] and the driver were probably engaged in a common enterprise." *United States v. Gary*, 790 F.3d 704, 707 (7th Cir. 2015). At best, a positive identification of one of the individuals would only serve to lessen the probable cause regarding the other occupants of the Pilot but not to establish probable cause to arrest Acevedo. Given the other information undergirding the probable cause analysis, "zeroing in" on only one of the three individuals in the van does not help move the needle as far as it needs to go.

Because the Government has failed to demonstrate that agents would have discovered any of the evidence by lawful means through a substantial and alternative line

---

[7] Even if the officers had initiated a *Terry* stop and had discovered the hotel key during a brief frisk, they could not have seized that key because such a frisk is limited to finding weapons. And, even if they had seized it, any follow up without arresting Acevedo is highly speculative.

of investigation it was pursuing,[8] the inevitable discovery exception to the exclusionary rule does not apply.

### III.    The Fruits of the Unlawful Arrest

The evidence Acevedo asks to be suppressed may be broadly categorized as follows: the evidence seized incident to his unlawful arrest; evidence seized from the hotel room; evidence seized from the Honda Pilot, including the cellphone for which police obtained a separate warrant; and Guerrero-Aguilar's out-of-court identification. Although the exclusionary rule applies to both evidence directly discovered as a result of an illegal search and derivative evidence, the Supreme Court has cautioned that suppression should be "our last resort, not our first impulse." *Strieff*, 136 S. Ct. at 2061. Accordingly, each category of evidence must be examined individually to ensure suppression is warranted by the agents' unlawful arrest.

The first category is the evidence obtained directly as a result of searching Acevedo incident to his unlawful arrest. This includes both the hotel room key taken form his person and the photograph taken during his arrest, as officers were not aware of Acevedo's existence prior to the arrest. This evidence is suppressed. *See, e.g., Sibron v. New York*, 392 U.S. 40, 62-63 (1968).

The remaining searches were each conducted pursuant to various warrants. When applying the exclusionary rule in such instances, "the sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that

---

[8] It is conceivable that agents could have ultimately discovered some, if not all, of the evidence by following up on other leads from their investigation of Guerrero-Aguilar. Notably, however, the Government does not argue, much less demonstrate by a preponderance of the evidence, how that would have come to be.

16

information." *United States v. Davis*, 760 F.3d 901 (8th Cir. 2014). As to the search of the hotel room, any information regarding Acevedo's arrest and the key card would necessarily be stricken from the supporting affidavit. Because the agents only knew which hotel to visit after they found the key card, the name of the hotel, the identification of the specific room, and the drug dog's positive alert are all derived from the unlawful seizure. Once this evidence is stricken from the supporting affidavit for the warrant, the affidavit only recounts the surveillance and ultimate arrest of Guerrero-Aguilar, as well as his post-arrest interrogation in which he identifies someone who agents eventually determined to be Acevedo. Gov't Ex. 3 (Appl. 2-3). That clearly falls far short of probable cause to search the hotel room. All evidence seized from the search of the hotel room, though conducted pursuant to a warrant, must also be suppressed.

The searches of the Honda Pilot and phone suffer the same fate. Absent the unlawful arrest, agents would not have been able to seize the Honda Pilot. More to the point, absent any reference to Acevedo's arrest and subsequent investigation, the affidavit in support of the search warrant contains no information, other than Guerrero-Aguilar's brief stint in the backseat, tying the Honda Pilot to illegal activity. Gov't Ex. 1 (Appl. 2-3). Without the authorization to search the Pilot and seize the cellphone left there, agents would not have been in a position to seize the phone. Any evidence from both searches must be suppressed.

## RECOMMENDATION

For the reasons stated above, the Court RECOMMENDS THAT Defendant's Motion to Suppress Evidence [Dkt. No. 44] be GRANTED and evidence be suppressed consistent with this R&R.

Dated: December 9, 2019

                                        s/ David T. Schultz
                                        DAVID T. SCHULTZ
                                        United States Magistrate Judge

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).